(No. 65473.—■

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. STANLEY HOWARD, Appellant.

*Opinion filed December 19, 1991.—Rehearing denied March 30, 1992.*

BILANDIC, J., took no part.

FREEMAN, J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Kyle Wesendorf and Rita A. Fry, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Stanley Howard, was convicted of murder and attempted armed robbery. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty on the ground that the murder was committed in the course of an attempted armed robbery, a statutory aggravating circumstance (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). The jury concluded that there were no mitigating circumstances sufficient to preclude imposition of the death penalty, and the trial judge therefore sentenced the defendant to death. The judge also sentenced the defendant to 15 years' imprisonment on the attempted armed robbery conviction.

The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons set out below, we affirm the judgment of the circuit court.

The facts surrounding the defendant's commission of the present offenses may be stated briefly. Around 4 a.m. on May 20, 1984, Oliver Ridgell was shot as he sat in a car parked on 92nd Street, between Loomis and Ada Streets, in Chicago. Ridgell died several hours later as a result of the gunshot wound. A passenger in the car, Tecora Mullen, was unharmed, and she testified in behalf of the prosecution at the defendant's trial. Mullen, who had known Ridgell for about 15 years, lived around the corner from where Ridgell parked. Mullen testified that it was raining lightly at the time of the shooting but that the windows on the driver's side of the car were unobscured. Mullen said that while she and Ridgell were sitting in the car talking, she saw a man approach the car from the opposite side of the street. At a police lineup conducted in November 1984, and later, at the defendant's trial in April 1987, Mullen identified the defendant as the offender.

According to Mullen, the defendant came up to the driver's side of the car and knocked on the driver's window. In response, Ridgell lowered the left rear window several inches, using the electric window opener. According to Mullen, the defendant then "asked for a light, or a match," to which Ridgell responded, "No, man, go ahead." The defendant stepped back five or six feet from the car, stamped his foot, and said, "All right, then, godammit." The defendant drew a gun from his jacket pocket, pointed the weapon at Ridgell, and fired. According to the autoptic and forensic evidence introduced at trial, the bullet shattered the left rear window of the car and struck Ridgell in the back.

Mullen dropped to the floor of the car after the shot was fired, and she was therefore unable to see in what direction the defendant fled following the incident. Mullen briefly left the car to summon help but, fearing that the gunman might still be in the vicinity, she quickly returned to the vehicle. With Ridgell still sitting in the driver's seat, Mullen then drove several blocks until she was able to stop a passing police car. Mullen reported the shooting to the officer, and paramedics were called to the scene. Ridgell died around 7:30 that morning. Mullen was later questioned by the police, and she provided officers with a description of the gunman.

A nearby resident also testified as an occurrence witness. Marilyn McDuffy lived in the building in front of which Ridgell had parked the car. McDuffy testified that she heard a commotion in the street around 4 a.m. on May 20, 1984. She then looked out a window and saw a woman running around a car shouting that someone had been shot. McDuffy did not witness the shooting and did not see anyone else in the street, but she believed she heard someone leave the scene on foot.

Investigating officers subsequently found a shell casing from a 9-millimeter semiautomatic pistol at the scene of the shooting. The murder weapon was never recovered. The defendant remained at large until November 1, 1984, when he was arrested by Chicago police officers on an unrelated warrant. Following the arrest, investigating officers discovered that the defendant matched the description provided by Tecora Mullen; in a lineup conducted on November 2, Mullen identified the defendant as the person who had shot and killed Ridgell. The defendant was questioned about the present offenses on November 3. After waiving his *Miranda* rights, the defendant initially denied having any information about the Ridgell murder. When the defendant learned that he had been identified as the gunman, he admitted his re-

sponsibility for the shooting. The defendant told officers that he had been walking around with a gun "looking for someone to rob." After providing an oral confession to the crimes, the defendant directed several police officers to the crime scene and reenacted his commission of the offenses.

The defendant later agreed to make a formal statement in the presence of a court stenographer, and the statement was introduced into evidence at trial. In the statement, the defendant said that he was at his girlfriend's house during the evening of May 19, 1984, until 11 o'clock. At that time the defendant went to the house of a friend, Byron, to "pick up a gun." Asked why he needed a gun, the defendant explained, "So I could try to get me some money." The defendant said that he left Byron's house around midnight and "wandered around for a little while *** [t]rying to find me a victim to stick up." Around 4:30 or 5 o'clock that morning the defendant saw two people sitting in a parked car near 92nd and Loomis Streets. The defendant walked up to the car and asked the driver for a cigarette; the driver replied that he did not have any. The defendant then said that he had his own cigarettes and asked the driver for a light. As the defendant reached into his pocket, he saw the driver reaching into his own pocket "like he was going for a gun." The defendant said that he backed away from the car, fired two or three shots at the driver, and then ran to his girlfriend's house, located one-half block away. The defendant said that he later returned the borrowed gun to his friend. In the statement, the defendant replied affirmatively to the assistant State's Attorney's question whether he intended to rob the occupants of the car when he approached the car.

Defense counsel presented evidence contradicting several facts related in the defendant's oral and signed statements. The defendant's girlfriend, Terry Jones, tes-

tified that she was living in a distant part of the city at the time of the offenses. Jones also stated that her mother, with whom she resided, did not permit the defendant to stay overnight. Byron Hopkins, the person identified in the defendant's statements as the source of the murder weapon, failed to respond to a defense subpoena to testify. His testimony was therefore introduced into evidence by way of stipulation. According to the stipulation, Hopkins, if called to testify, would have denied that he supplied the defendant with a weapon and would have stated that he did not own a 9-millimeter gun of the type used by the defendant.

Following the close of evidence, the jury found the defendant guilty of murder and of attempted armed robbery, and judgment was entered on the verdicts. A separate sentencing hearing was then conducted before the same jury to determine whether the defendant would receive the death penalty for the murder conviction. In the first stage of the sentencing hearing, the prosecution presented evidence that the defendant, born in November 1962, was 21 years old at the time of his commission of the murder charged here and thus was of a death-eligible age (see Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)). The prosecution also introduced into evidence the verdict forms reflecting the defendant's convictions for murder and attempted armed robbery. Following deliberations, the jury found the defendant eligible for the death penalty on the basis of his commission of murder during the course of attempted armed robbery (see Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), the sole statutory aggravating circumstance alleged by the prosecution in the present case.

During the second stage of the sentencing hearing, the State presented detailed evidence of the defendant's extensive criminal history, comprising nearly a dozen separate occurrences. For the most part, this informa-

tion was introduced through the testimony of the victims of the defendant's prior offenses. The evidence is summarized below in chronological order.

On March 9, 1981, the defendant was convicted of theft and was sentenced to serve two days in jail and one year's conditional discharge. According to the certified copy of conviction for the offense, that charge was brought against Don Sanders, also known as Stanley Howard.

During the evening of March 13, 1983, the defendant accosted a woman and her young son outside their home. Armed with a pistol, the defendant forced the woman and the child into their car and then drove off. As they were driving, the defendant demanded the woman's jewelry and threatened to rape her. The woman directed the defendant to her mother's house, where she said she could obtain some money. The woman's mother refused to let them inside but did give her daughter $20. The defendant then drove the woman and her child back to their apartment. The defendant ransacked the premises, looking for valuables. He eventually left with the woman's car, which was recovered several days later.

Also during the night of March 13-14, 1983, the defendant, while armed with a pistol, entered a vehicle in a restaurant parking lot and demanded money from the two occupants, off-duty police officers. The defendant threatened to rape the woman in the back seat of the vehicle. The woman was able to kick the defendant as he was exiting the vehicle, and the defendant then fled. The male officer and the defendant exchanged gunfire. The officers identified the defendant as their assailant in a lineup conducted on November 2, 1984, and the defendant was later convicted of the armed robbery of the two officers.

On May 27, 1983, the defendant accosted a female deputy sheriff as she was getting into her car to drive to

work. The defendant put a gun to the woman's side, pushed the woman into the car, and drove off. The defendant eventually drove the deputy to the home shared by the deputy's 45-year-old sister-in-law and the sister-in-law's 53-year-old male cousin. There, the defendant ransacked the premises, tied up the cousin, raped the deputy, forced the deputy to perform oral sex on him, and then forced the deputy and her sister-in-law to perform oral sex on the cousin. Afterwards, the defendant took money and jewelry from the house and forced the two women into the car. The sister-in-law managed to escape from the vehicle. The defendant drove the deputy to another location, where he raped her again and then released her. The deputy identified the defendant as the assailant in a lineup conducted on November 2, 1984. The defendant was later convicted of the aggravated kidnapping, kidnapping, armed robbery, rape, and deviate sexual assault of the deputy, of home invasion, and of the deviate sexual assault of the deputy's sister-in-law.

On May 29, 1983, a police officer found the defendant in possession of a small quantity of marijuana. The defendant was later charged with and convicted of a misdemeanor for that offense, and he was fined a small amount and was sentenced to serve two days in jail.

Over the defendant's objection, the State also presented evidence of a break-in at a private residence in Chicago on June 20, 1983. On that occasion, an intruder wearing a ski mask entered a house sometime after midnight, confronted the female occupant, and threatened to kill her if she screamed. The intruder held something metallic to the woman's neck. The intruder then removed several pieces of jewelry from around the woman's neck. The intruder fled when the woman's husband returned home. The defendant was found five days later in possession of certain items of jewelry taken during

the break-in. The defendant was initially charged with the offense, but the charges were dismissed when the victims were unable to identify the defendant as the intruder.

On October 28, 1983, the defendant stole a car from a woman in a parking lot. Around 9:30 that evening the owner was standing next to her car when the defendant ran up, pushed the woman aside, jumped into the vehicle, and drove off. The car was recovered several hours later, and the defendant was taken into custody at that time. The defendant was charged with robbery and was later released on bond. The case had not come to trial by the time of the present sentencing hearing.

In December 1983, the defendant stole a purse from a woman standing outside her home. The purse contained $700 the woman had won that night while bowling. The defendant was later charged with felony theft; the case had not come to trial by the time of the present sentencing hearing.

The prosecution also introduced evidence of offenses committed by the defendant at a home in Blue Island on June 21, 1984. The defendant entered the home around 11:30 that night, surprising the two occupants, a man in his sixties and a woman who was about seven years younger. The defendant tied the man's hands and covered him with an afghan. The defendant then sexually assaulted the woman. The defendant took about $800 in cash from the man and drove off in the man's car. Viewing a photographic array several weeks later, the two victims identified the defendant as the assailant. The victims identified the defendant once again in a lineup conducted on November 2, 1984.

A Cook County correctional officer testified that the defendant was involved in a fight at the county jail in December 1984 and served 10 days in segregation as punishment for the infraction. Another correctional offi-

cer testified that on December 11, 1986, a search of the defendant's jail cell revealed two ounces of marijuana and one gallon of home-made alcohol. The defendant was placed in segregation for five days as a result of his possession of the contraband.

The defense presented five witnesses in mitigation at the sentencing hearing. Henry Troka, a lieutenant employed at the Cook County jail, testified that the defendant had been cooperative and had provided the staff with certain information, including tips regarding the presence of weapons within the incarcerated population. Lieutenant Troka also testified that the defendant had cooperated in the investigation of a fight among several other inmates. The witness stated that he did not consider the defendant to be a dangerous inmate.

Betty Howard, the defendant's aunt, testified that she had known the defendant for some 19 years. Howard provided favorable testimony, and she described the defendant as having been kind and helpful. Thomas Gibson, a friend of the defendant's family, testified that he regarded the defendant as a son. Gibson stated that the defendant had always been respectful toward him. Gibson, who had visited the defendant in jail, expressed the view that the defendant could be rehabilitated.

The defendant's father, William Travis, also testified in behalf of the defendant. Travis had been divorced from the defendant's mother for about 15 years but had remained in contact with his son. Travis was a self-employed house painter, and the defendant had worked for him a number of times. Travis believed that his son could be rehabilitated. The defendant's mother, Jeanette Johnson, testified that the defendant was loving, considerate, and well-behaved. She stated that the defendant had often been helpful to her around the house.

Following the presentation of evidence in aggravation and mitigation, the jury found that there were no miti-

gating circumstances sufficient to preclude imposition of the death penalty. The trial judge accordingly sentenced the defendant to death for the murder conviction. In addition, the judge sentenced the defendant to 15 years' imprisonment for the attempted armed robbery conviction, with that sentence to run concurrently with terms of imprisonment previously imposed for other offenses.

## I

### A

The defendant raises a number of issues concerning the guilt-innocence phase of the proceedings. The defendant first argues that his conviction for attempted armed robbery must be reversed because the State failed to present sufficient evidence of the *corpus delicti* of that offense. The defendant contends that no other evidence, apart from his own confessions, tended to show that the offense of attempted armed robbery occurred. The defendant makes the related argument that his death sentence must also be vacated, because the attempted armed robbery conviction supplied the sole statutory basis rendering him eligible for the death penalty.

The *corpus delicti* of an offense has been defined as the occurrence of the injury or loss and its causation by criminal conduct. (*People v. Furby* (1990), 138 Ill. 2d 434, 446, citing 7 J. Wigmore, Evidence §2072, at 524-25 (Chadbourn rev. ed. 1978); 1 W. LaFave & A. Scott, Substantive Criminal Law §1.4, at 24 (1986).) Under the prevailing view, proof of the *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other statement. (*Furby*, 138 Ill. 2d at 446, citing 7 J. Wigmore, Evidence §2071 (Chadbourn rev. ed. 1978); E. Cleary, McCormick on Evidence §145 (3d ed. 1984).) Rather, under the rule applied in Illinois, the prosecution must present evidence apart from the

defendant's own statements that tends to show the commission of the offense and that corroborates the facts related in the statement. (*Furby*, 138 Ill. 2d at 446.) This court has explained:

"[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*. In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur." (Emphasis in original.) *People v. Willingham* (1982), 89 Ill. 2d 352, 361.

The defendant argues that the evidence in the present case failed entirely to show the *corpus delicti* of attempted armed robbery. The defendant contends that Tecora Mullen's testimony and the physical evidence introduced at trial showed only that a murder occurred and did not sufficiently corroborate the defendant's confession of the attempted armed robbery. We do not agree.

The independent evidence introduced at trial was sufficiently corroborative of the defendant's confessions. That evidence and the defendant's statements, combined, established the *corpus delicti* of the attempted armed robbery charge. In his statements to authorities, the defendant said that he first obtained a 9-millimeter pistol from a friend around midnight and then began looking for someone to rob. Several hours later, the defendant found Ridgell's car. Intending to rob the occupants, the defendant approached the vehicle and knocked on the driver's window. On a pretext, the defendant requested a cigarette. When Ridgell replied that he did not have any cigarettes, the defendant said that he had his own and asked for a light. When Ridgell made a gesture suggesting that he was armed, the defendant pulled out

the pistol he had borrowed earlier that night and fired. The defendant then fled.

The facts related in the defendant's statements were corroborated by Mullen's testimony and the physical evidence. Mullen stated that at the time in question she and Ridgell were sitting in Ridgell's car at the location where the offenses occurred. Mullen saw the defendant approach the car and knock on Ridgell's window. Mullen heard the defendant request a light and heard Ridgell refuse that request. Mullen then saw the defendant take out a gun, step back several paces, and fire the weapon in Ridgell's direction. The physical evidence introduced by the State further corroborated the defendant's confessions. A 9-millimeter shell was found at the crime scene. In addition, there was testimony that the lead fragment recovered from the murder victim's body could have been fired from a 9-millimeter pistol of the type the defendant said he had used.

Evidence corroborating the statement of an accused need not independently establish the offense beyond a reasonable doubt. Rather, it is sufficient if the corroborating evidence tends to show the commission of the offense. (*Willingham*, 89 Ill. 2d at 361; *cf. People v. Lee* (1986), 151 Ill. App. 3d 510, 531-32 (reversing conviction for attempted armed robbery where only evidence of attempt was contained in defendant's statement; court noted that victim did not complain of attempted armed robbery; court also noted that defendant admitted attempted armed robbery against second person, but that that person testified that no attempt was made).) We conclude that Mullen's testimony and the physical evidence sufficiently corroborated the defendant's declarations in his oral and signed confessions that he intended to commit armed robbery and that he was attempting to do so at the time in question. Mullen described the defendant's approach toward the vehicle, his attempt to

engage Ridgell in conversation, and his shooting of Ridgell. This testimony tended to corroborate the defendant's own account of his attempt to commit the offense. In addition, the physical evidence introduced at trial tended to confirm the defendant's use of the type of weapon he said he had borrowed from his friend.

We conclude further, on the record in this case, that the independent evidence and the defendant's own statements established the *corpus delicti* of the offense. In combination, the independent evidence and the defendant's statements showed that he took a substantial step toward the commission of an armed robbery. We therefore uphold the defendant's conviction for attempted armed robbery. Accordingly, we need not address the defendant's related argument that reversal of that conviction would now remove the basis for his eligibility for the death penalty.

## B

The defendant next argues that the trial court erred in denying a pretrial motion to suppress the statements he made following his arrest. Prior to trial, the defendant moved to suppress his statements on several different grounds, contending that the police failed to honor his request for counsel, that he did not receive valid *Miranda* warnings prior to being questioned, and that he was beaten by the interrogating officers. Following an evidentiary hearing, the trial judge refused to suppress the defendant's statements. The judge found that the defendant received *Miranda* warnings, waived his rights, and spoke with the officers voluntarily. The judge also rejected the defendant's alternative argument that the statements were the product of physical coercion. Before this court, the defendant raises only the last contention, that his statements were coerced and thus were involuntary and inadmissible.

The following evidence was presented at the suppression hearing. Around 5:30 p.m. on November 1, 1984, Chicago police officers went to a residence in Chicago to arrest the defendant on an outstanding warrant in an unrelated case. The defendant fled when the officers approached the house and identified themselves, and a lengthy chase ensued. The defendant was eventually apprehended, and he was then taken to Area 2 headquarters. The defendant appeared in a number of lineups the next day, November 2.

The defendant was first questioned with respect to the present offenses early on November 3. Detectives James Lotito and Ronald Boffo spoke with the defendant around 1:30 that morning, and the defendant then gave a statement in which he admitted his commission of the crimes. Sergeant John Byrne, the felony watch coordinator, was also present from time to time. Around 4 o'clock that morning the defendant directed the officers to the crime scene, where he reenacted his commission of the offenses. The officers and the defendant then returned to Area 2 headquarters. Sometime after 9 o'clock that morning, the defendant was questioned by Assistant State's Attorney Denise O'Malley, a member of the felony review unit. Detective Lotito and Detective Robert Dwyer were also present during the interrogation. The defendant later agreed to provide authorities with a formal statement detailing his involvement in the offenses. He made the statement around 1 p.m. on November 3. Present at that time were Assistant State's Attorney O'Malley, Detective Lotito, Detective Dwyer, and Joseph Szybis, a court reporter. At the suppression hearing, the witnesses who were in contact with the defendant during the period in question denied that he was mistreated. The witnesses further testified that the defendant never made any complaints to them concerning his treatment. O'Malley acknowledged that she was later questioned by

a Federal agent concerning a complaint of police brutality lodged by the defendant.

The defendant testified that on November 3, he was questioned by Detectives Lotito and Boffo about the Ridgell murder. According to the defendant, the officers became angry and began punching him when he denied having any knowledge about the crime. The defendant testified that he was repeatedly kicked in the left leg and shin and slapped in the face. The defendant explained that he later gave a signed statement confessing his involvement in the offenses because he was forced to do so. At the suppression hearing, defense counsel also presented the testimony of Wayne Kinzie, a paramedic, who had examined the defendant at the Cook County jail on November 4, 1984. According to Kinzie, the defendant complained that he had been beaten by the police. Kinzie saw abrasions on the defendant's left leg and bruises and cuts on the defendant's chest. The defendant told Kinzie that he had incurred those injuries at the hands of the police the previous day. On cross-examination, Kinzie testified that he did not observe any injuries to the defendant's head. Kinzie explained that the abrasions on the defendant's leg could have been caused by scraping the leg against the ground; Kinzie stated that the injuries were not likely to have been caused by a kick. Kinzie also stated that he could not determine the age of the cuts and bruises on the defendant's chest.

At the conclusion of the hearing, the trial judge denied the suppression motions. The judge found that the defendant had received and waived valid *Miranda* warnings prior to making his statements. The judge also found that the defendant was not physically coerced. Before this court, the defendant renews only the last contention, arguing that his inculpatory statements were the products of physical coercion and that the trial judge thus erred in refusing to suppress those statements. As

we explain below, we decline to disturb the trial judge's ruling on this matter.

The defendant contends that the trial judge erred in refusing to suppress his statements because the State failed to demonstrate by clear and convincing evidence that the defendant's injuries were not the result of police misconduct. Citing cases such as *People v. Wilson* (1987), 116 Ill. 2d 29, and *People v. La Frana* (1954), 4 Ill. 2d 261, the defendant insists that the State failed to show in what manner these injuries were incurred.

We do not agree with the defendant that the evidence established that he was injured while in police custody. The trial judge was free to credit the testimony of the officers and the paramedic that the defendant did not sustain any injuries to his face or head. The injuries that the defendant did sustain, to his leg and chest, would not have been visible to the officers. The evidence presented at the hearing supports the inference that the defendant incurred those injuries while he was attempting to elude the arresting officers. According to that evidence, the defendant, during the chase, climbed over fences and crawled under porches. The paramedic testified that the abrasions on the defendant's leg were consistent with scraping the leg against the ground; the witness did not believe it was likely that the leg injuries could have been caused by a kick, as the defendant claimed. Thus, in the present case, there was either no corroboration that the defendant incurred certain injuries he claimed to have suffered (see *People v. King* (1986), 109 Ill. 2d 514, 526; *In re Lamb* (1975), 61 Ill. 2d 383, 388), or an adequate explanation for the injuries he did sustain (see *People v. Pittman* (1973), 55 Ill. 2d 39, 53-54; *People v. Scott* (1963), 29 Ill. 2d 97, 102-03). On this record, then, we cannot say that the trial court's decision was contrary to the manifest weight of the evidence.

## C

The defendant next raises several challenges to the manner in which the jury was selected in the present case. The defendant argues that the errors alleged denied him due process and violated his right to trial before a fair and impartial jury, under both the United States and Illinois Constitutions. (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§2, 8.) Before the beginning of *voir dire,* defense counsel asked that each of the prospective jurors be examined separately, apart from the remainder of the venire. The trial judge denied the defendant's request. Before this court, the defendant argues that the trial judge erred in refusing to conduct the *voir dire* in the manner urged.

"The purpose of *voir dire,*" this court has noted, "is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. [Citations.]" (*Kingston v. Turner* (1987), 115 Ill. 2d 445, 464.) We cannot say that this purpose was frustrated in the present case. There is no indication in the record that any of the prospective jurors failed to respond fully and frankly to the questions put to them during *voir dire,* or that any of their responses to the questions influenced any other member of the venire. The defendant does not contend that any one of the persons selected to serve on the jury was other than impartial. We do not believe that the trial judge abused his discretion in denying the defendant's request for a sequestered *voir dire.* See *People v. Neal* (1985), 111 Ill. 2d 180, 197-98; *People v. Newbury* (1972), 53 Ill. 2d 228, 241.

The defendant next contends that the trial judge erred in denying a defense motion that the attorneys themselves be permitted to question the prospective jurors during *voir dire.* In denying the defendant's request, the trial judge explained that it was his practice

to conduct the *voir dire* himself. The judge stated, however, that he would provide counsel with the questions he planned to ask the venire and that he would invite counsel to propose supplemental questions if they believed any were necessary. The judge also explained that throughout *voir dire* the parties would be free to suggest additional questions for individual members of the venire.

Supreme Court Rule 234, applicable to criminal trials through Rule 431, vests a trial judge with broad discretion in determining whether to permit counsel to question prospective jurors during *voir dire*. (134 Ill. 2d Rules 234, 431; see also *People v. Lewis* (1981), 88 Ill. 2d 129, 156; *People v. Jackson* (1977), 69 Ill. 2d 252, 260.) We cannot say in the case at bar that the trial judge abused his discretion in declining to permit the attorneys to question the prospective jurors themselves. The trial judge examined each prospective juror at length, inquiring into matters such as employment and family status. The trial judge also made detailed inquiries of the type required by *People v. Zehr* (1984), 103 Ill. 2d 472, to ensure that the prospective jurors understood that the defendant was presumed innocent of the charges, that the State was required to prove the defendant's guilt beyond a reasonable doubt, and that the defendant was entitled not to testify at trial. In addition, the judge explored the venire members' attitudes on issues such as capital punishment, using both "death-qualifying" and "life-qualifying" questions. The trial judge thoroughly tested the competence and impartiality of each prospective juror. On this record, it is clear that the parties were afforded a full opportunity to make challenges for cause and to exercise their allotment of peremptory challenges on an informed and intelligent basis. We find no abuse of discretion here in the trial judge's denial of the

defense request for direct attorney participation in *voir dire*. See *People v. Gacy* (1984), 103 Ill. 2d 1, 36-37.

The defendant also argues that the trial judge erred in refusing defense counsel's request that the prospective jurors be questioned about their attitudes toward guns. The present offenses were committed with a handgun, and the defendant contends that the controversial nature of handgun use warranted a special inquiry in this case.

Following the trial judge's denial of the defendant's request that the attorneys themselves be allowed to question the prospective jurors, defense counsel submitted a list of supplemental questions that counsel wanted the judge to ask during *voir dire*. At issue here is the following question proposed by defense counsel: "The State will seek to introduce evidence that a handgun was used. Do you have any strong feelings about handguns which would affect you?" The trial judge declined to use the proposed question, explaining that he believed that the question was not pertinent and was remote from the type of inquiry properly made during *voir dire*.

We find no abuse of discretion in the trial judge's refusal to question the venire concerning their viewpoints about handguns. Although it is true, as the defendant points out, that in *People v. Stack* (1986), 112 Ill. 2d 301, this court found reversible error in a trial judge's refusal to question prospective jurors about their attitudes toward the insanity defense, an issue in the case, we do not believe that the concerns animating that decision are present here. In *Stack* the court noted the especially controversial nature of the insanity defense, a matter involving one of the forms of verdict available in the case. (*Stack*, 112 Ill. 2d at 312-13.) In the present case, in contrast, the offender's use of a handgun as his weapon in committing the crimes charged was not a central issue at trial, much less pertinent to any of the forms of ver-

dict. Supreme Court Rule 234 reflects the general principle that the "manner and scope of the *voir dire* examination is left to the discretion of the trial court." (*People v. Porter* (1986), 111 Ill. 2d 386, 401.) As we have stated, the trial judge conducted a searching inquiry during *voir dire*, examining each of the prospective jurors on a variety of matters germane to the present case, and tested at length their qualifications to serve as jurors. We cannot say that the trial judge's refusal to ask the handgun question denied defense counsel an informed and intelligent basis on which to assert challenges for cause or to exercise peremptory challenges.

In his final challenge to the jury selection procedures conducted in the present case, the defendant argues that the State improperly exercised peremptory challenges against two of the prospective jurors. The individuals in question expressed disapproval of the death penalty but were not excludable for cause under the principle first articulated in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and further refined in *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521, and *Wainwright v. Witt* (1985), 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844. The defendant believes that the prosecution's conduct in peremptorily challenging these two persons produced a jury that was inclined to return a verdict imposing the death sentence, in violation of the defendant's rights under the sixth, eighth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, VIII, XIV). This court earlier rejected a similar contention in *People v. Stewart* (1984), 104 Ill. 2d 463, 481-83, and *People v. Albanese* (1984), 104 Ill. 2d 504, 523-24; contrary to the defendant's argument, we do not believe that the Supreme Court's intervening decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, now compels a different result.

In *Batson*, and in later cases as well, the Supreme Court has declared that parties may not use peremptory challenges to exclude from jury service prospective jurors solely on account of their race. The exclusion of prospective jurors on racial grounds, the Court has stated, violates the equal protection rights of the persons excluded. (See *Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077; *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364; *cf. Holland v. Illinois* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803 (race-based exclusion of prospective juror does not violate defendant's sixth amendment right to trial by impartial jury).) In enforcing the *Batson* rule, a court may inquire into the reasons underlying the prosecution's exercise of a peremptory challenge against a particular member of the venire. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24.) The defendant argues that the inquiry contemplated by *Batson* must also extend to a prosecutor's decision to peremptorily challenge a prospective juror who expresses reservations about the death penalty but who is not excludable for cause on that ground. We do not agree.

As we have stated, *Batson* and its progeny rest on the principle that racial exclusion from jury service violates equal protection. It is also clear, however, that *Batson* did not contemplate further limitations on the exercise of peremptory challenges. It is appropriate to note that, in resolving *Batson* claims, courts have upheld prosecutors' challenges to prospective jurors on the very ground challenged here: the person's viewpoints toward the death penalty. (See, *e.g., People v. Mack* (1989), 128 Ill. 2d 231, 240.) Since *Batson*, the Court has recognized that prosecutors often use peremptory challenges to exclude jurors because of their views on the death penalty, making no suggestion that *Batson* would have any effect

on that practice. (*Gray v. Mississippi* (1987), 481 U.S. 648, 667-68, 95 L. Ed. 2d 622, 639, 107 S. Ct. 2045, 2056 (plurality opinion); see also *Gray*, 481 U.S. at 671-72, 95 L. Ed. 2d at 642, 107 S. Ct. at 2058 (Powell, J., concurring in part and concurring in the judgment) ("This Court's precedents do not suggest that the *Witherspoon* line of cases restricts the traditional rights of prosecutors and defense counsel to exercise their peremptory challenges" to exclude prospective jurors on the basis of their views on capital punishment).) Discussing the same contention raised here, Justice O'Connor has explained, "Outside the uniquely sensitive area of race the ordinary rule that a prosecutor may strike a juror without giving any reason applies." (*Brown v. North Carolina* (1986), 479 U.S. 940, 942, 93 L. Ed. 2d 373, 374, 107 S. Ct. 423, 424 (O'Connor, J., concurring in denial of *certiorari*).) Other courts, too, have held that *Batson* and *Witherspoon* together do not forbid the prosecutor to peremptorily challenge potential jurors on the basis of their viewpoints toward capital punishment. (See *Brown v. Dixon* (4th Cir. 1989), 891 F.2d 490; *People v. Davis* (Colo. 1990), 794 P.2d 159; *State v. Allen* (1988), 323 N.C. 708, 372 S.E.2d 855.) We conclude that *Batson* does not mandate the sort of inquiry requested by the present defendant.

### D

The defendant next contends that the prosecutor made a number of improper comments during opening statement at the guilt-innocence phase of the proceedings. The defendant first asserts that the prosecutor improperly suggested that the defendant had threatened witnesses in the case, when the prosecutor described the State's witnesses as "[c]ommon day people who have the courage to come in here and tell you what they heard and saw." Here, the trial judge promptly sustained the

defendant's objection to the comment. "[A]lthough the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court [citation], the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice. [Citations.]" (*People v. Baptist* (1979), 76 Ill. 2d 19, 30.) There is no reason to suppose that the court's ruling sustaining the defendant's objection was not similarly effective here. The prosecutor's remark was brief, and the error was not repeated.

The defendant next contends that the prosecutor, in his opening statement, improperly suggested to the jury that the indictment returned in the present case represented evidence of the defendant's guilt for the offenses charged. The prosecutor stated:

> "That is the evidence we are going to present to you over the course of the next few days, in determining whether or not he committed the offense charged with [*sic*], that the Judge read to you earlier, that the Grand Jury indicted him for."

The defendant now contends that the jurors would have construed the prosecutor's comment as suggesting that the return of the indictment constituted evidence of guilt.

Defense counsel failed to object to the remark. The present argument must therefore be deemed waived because of counsel's procedural default unless it can be said that the comment was "so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. [Citation.]" (*People v. Albanese* (1984), 104 Ill. 2d 504, 518.) That is not the case here. Viewed in context, the prosecutor's brief remark was, we believe, merely a neutral reference to the fact that prosecution of the present

case had been commenced by indictment. The prosecutor stated only that the jury would be determining *whether or not* the defendant was guilty of the offenses charged; the prosecutor did not suggest that the indictment itself was evidence of guilt. We note also that the jury was properly instructed on the purpose of the charging instrument. (See Illinois Pattern Jury Instructions, Criminal, No. 2.02 (2d ed. 1981).) We find no error in the prosecutor's brief reference to the indictment.

The defendant also complains that the prosecutor, in recounting the events leading up to the defendant's arrest, improperly asserted that Tecora Mullen's description of the offender matched a description on file with the Blue Island police department in connection with another case. The defendant argues that there was no evidence to support this assertion. As a preliminary matter, we note that defense counsel failed to object to the comment now challenged, and therefore the alleged error would normally be deemed waived. At any rate, we do not agree with the defendant's interpretation of the prosecutor's remarks. It appears that the prosecutor instead stated that the defendant, following his arrest on the Blue Island warrant, was seen by the Chicago officers, who observed that he matched the description provided by Tecora Mullen. The officers in question testified at trial, and their testimony substantiated the prosecutor's assertion. We find no error in the challenged remarks.

### E

The defendant next contends that reversible error occurred when, at a number of points in the proceedings, the trial judge and the prosecutor referred to an alias, "Don Sanders," allegedly used by the defendant. The defendant cites six separate instances during the course of the trial when mention was made of the alias. The

defendant was identified in each count of the multicount indictment as "Stanley Howard, also known as Don Sanders"; in reading that document to the prospective jurors, the trial judge twice referred to the defendant in that fashion. Later, during opening statement, the prosecutor on two occasions stated that the defendant was also known as Don Sanders. Following Detective Lotito's in-court identification of the defendant, the prosecutor stated for the record that the defendant was also known as Don Sanders. Finally, Assistant State's Attorney O'Malley, who questioned the defendant when he gave his formal statement, replied affirmatively to the prosecutor's question whether the defendant was also known as Don Sanders.

At no point in the proceedings did defense counsel object to any of the references to the alias. The defendant now contends that his alleged use of an alias was irrelevant to the issues in the present case. The defendant asserts that these references cast his character in a negative light and were prejudicial, for they suggested his involvement in unrelated criminal activity.

It is proper to show that an accused is the same person as that named in an indictment. (*People v. Berlin* (1979), 75 Ill. 2d 266, 268-69.) The indictment in the present case identified the defendant by both his actual name and his alias; accordingly, it was appropriate for the State to establish that the defendant was also known by the name of Sanders. And unlike the prosecutor in *People v. Dukes* (1957), 12 Ill. 2d 334, cited by the defendant, the prosecutor here did not attempt to suggest that the defendant's alias was indicative of prior criminal activity, or suggestive of a bad character. In *Dukes*, the prosecutor referred repeatedly, both in opening statement and closing argument, to the defendant's alias. The prosecutor also suggested, in opening statement, that the grand jury had had a reason for choosing

the particular alias contained in the indictment. In addition, the prosecutor declared in closing argument " 'that people use different names for different reasons.' " (*Dukes*, 12 Ill. 2d at 342.) This court concluded that the trial judge's failure to sustain the defendant's objections to those remarks was reversible error. In contrast, in the present case, the references to the defendant's use of another name were infrequent; there was no attempt made to argue or present the information in a negative manner; indeed, at no time was the term "alias" even used.

F

The defendant next contends that the trial court improperly restricted his trial attorney's cross-examination of prosecution witness Tecora Mullen. Prior to trial, the judge granted the State's motion *in limine* to preclude cross-examination of Mullen on the question whether she was engaged in a romantic relationship with Ridgell at the time of the offenses charged here. The defendant argues that the restriction imposed by the court impaired his right of cross-examination and his ability to present a defense to the charges (see U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8).

According to the statements of counsel at the hearing on the State's motion *in limine*, both Mullen and Ridgell were married at the time of Ridgell's murder. Also at the hearing, defense counsel represented that the police had initially investigated the case as a family-related homicide and had questioned Mullen's husband and given him a lie-detector test. The trial judge granted the State's motion, declaring that the suggested cross-examination was entirely speculative. Before this court, the defendant argues that the trial judge's ruling improperly restricted counsel's cross-examination of this key prosecution witness. The defendant asserts that the evidence

was relevant because it suggested that Mullen's husband—or Ridgell's wife—had a motive to commit the offenses charged here. The defendant makes the allied claim that Mullen could have had a motive to misidentify the actual offender.

We do not believe that the trial judge abused his discretion in granting the State's motion *in limine* and in refusing to permit the defendant to cross-examine Tecora Mullen on the subject of her marriage and the nature of her relationship with the decedent. Although it is well established that an accused may offer evidence tending to show that the offense charged was committed by someone else (see *Synon v. People* (1901), 188 Ill. 609, 627; *People v. Nitti* (1924), 312 Ill. 73, 90), it is equally clear that such evidence is properly excluded if it is remote or speculative (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56; *People v. Dukett* (1974), 56 Ill. 2d 432, 450). The trial judge properly rejected the information here on the ground that it was speculative. The defendant's theory that Mr. Mullen—or Mrs. Ridgell—might have been involved in the present offenses is groundless; the defendant points to no evidence linking either spouse to the murder. The trial judge properly precluded the suggested inquiry.

### G

The defendant next contends that the trial judge erred in denying defense counsel's request for a mistrial following an outburst by a courtroom spectator in the course of the proceedings. The outburst occurred during the testimony of Tecora Mullen, who was the prosecution's first witness at trial. The defendant argues that the incident was so inflammatory that he was denied his right to a fair trial and to a fair sentencing hearing.

The transcript in this case does not contain a contemporaneous rendering of the outburst. (*Cf. People v. Ma-*

*haffey* (1989), 128 Ill. 2d 388, 419-20.) According to re-
marks later made by the parties and the court, however,
it appears that a female spectator made a comment
while Mullen was testifying and was immediately es-
corted from the courtroom. After Tecora Mullen con-
cluded her testimony, defense counsel made a' motion for
a mistrial on the basis of the spectator's outburst. Out-
side the jury's presence, defense counsel stated:

"First of all, there was an outbreak in the courtroom
with a woman who is sitting in the first row of the gal-
lery, who was very much upset, and she screamed and
started crying.

And I believe I heard her say—I could be wrong—
'Oh, my God, he killed my only child.'

It was [a] very emotional scene, and we believe that,
I mean it really appeared—I know it shook me, and it
shook some other people in the courtroom."

In response, the prosecutor stated that he was seated
in front of the spectator at the time of the incident but
did not understand what the woman said. The prosecu-
tor stated that the woman was led from the courtroom
and that Mullen then proceeded with her testimony. Dis-
puting defense counsel's assertion that other persons
present in the courtroom were shaken by the incident,
the prosecutor said that he had observed no effect on
the jurors.

The trial judge denied the defendant's motion for a
mistrial. The judge explained:

"I observed, naturally, the woman get up from her
seat and say something. I couldn't discern exactly what
she said.

She said it in [a] rather loud fashion, and then left
the courtroom.

I then instructed the Sheriff to go out in the hallway
and not permit her to re-enter the courtroom unless he
was assured there would be no further outbursts of that
nature.

I will caution the jury about the outburst before we proceed with the next witness.''

When the jury returned to the courtroom, the trial judge made the following remarks:

"Ladies and gentlemen, before we proceed with the next witness, during the testimony of Tecora Mullen, there was an incident in the spectator's [*sic*] section.

A woman said something, got up and left the court-room.

You are instructed to disregard that incident, and disregard anything that woman might have said, and rely only on the evidence that you hear in this case.''

The defendant renews here his argument that the trial judge erred in refusing to declare a mistrial in the wake of the spectator's outburst.

We do not consider that the trial judge abused his discretion in denying the defendant's motion for a mistrial. The decision whether to grant a mistrial because of incidents occurring during a proceeding is reserved to the sound discretion of the trial court. (*People v. Jones* (1988), 123 Ill. 2d 387, 410.) By virtue of his presence in the courtroom, the trial judge, rather than a court of review, is in a superior position to gauge the effect of an in-court occurrence on the jury. In the present case, the trial judge concluded that the spectator's outburst was not so prejudicial or inflammatory that a mistrial was warranted. The judge later admonished the jurors to disregard the incident. On the record before us, we are unable to conclude that the trial judge abused his discretion in refusing to grant the defendant's request for a mistrial. (See *People v. Mahaffey* (1989), 128 Ill. 2d 388, 419-23; *People v. Hall* (1986), 114 Ill. 2d 376, 404-05; *People v. Herbert* (1935), 361 Ill. 64, 71-72.) The outburst was an isolated incident occurring in the course of a lengthy trial; there is no indication in the record that the jury would not have been able to heed the trial judge's

admonition and erase the incident from their minds during their deliberations.

We must also reject the defendant's related contention that the incident tainted the jury's sentencing determination. The defendant alleges that in the outburst the jury heard inadmissible information that the decedent in this case was an only child. As we explain later in this opinion, evidence of this nature is no longer inadmissible at capital sentencing hearings. See *Payne v. Tennessee* (1991), 501 U.S. ___, 115 L. Ed. 2d 720, 111 S. Ct. 2597.

### H

In his final group of arguments pertaining to the guilt-innocence phase of the proceedings, the defendant raises several challenges to portions of the prosecution's closing argument. The defendant first contends that the prosecutor improperly commented on his failure to testify at trial. In rebuttal argument, the prosecutor told the jury:

"He says that right in the statement.

Where is the evidence to show it is wrong? Where is something from the witness stand?

[Defense counsel]: Objection.

THE COURT: Overruled.

[Assistant State's Attorney]: Where is something from the witness stand to support [defense counsel's] argument that [that] doesn't prove attempt armed robbery?"

The defendant contends that the prosecutor's remark improperly commented on and drew attention to his failure to testify in his own behalf at trial.

An accused has a constitutional right not to testify as a witness in his own behalf (U.S. Const., amend. V), and the prosecution is forbidden to comment on a defendant's exercise of that right (*Griffin v. California* (1965),

380 U.S. 609, 613-15, 14 L. Ed. 2d 106, 109-10, 85 S. Ct. 1229, 1232-33; *People v. Ramirez* (1983), 98 Ill. 2d 439, 450-51; *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51; see also Ill. Rev. Stat. 1983, ch. 38, par. 155—1 (prohibiting comment on criminal defendant's decision not to testify)). Yet the prosecution may remark on the uncontradicted character of the evidence of the defendant's guilt, and not every reference to the unrebutted character of the prosecution's evidence must necessarily be construed as an impermissible comment on an accused's failure to testify. (See *People v. Lyles* (1985), 106 Ill. 2d 373, 390.) In determining whether improper comment has been made on a defendant's assertion of his right not to testify in his own behalf, a court will consider whether " 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' [Citations.]" (*People v. Hopkins* (1972), 52 Ill. 2d 1, 6; see also *People v. Morgan* (1986), 112 Ill. 2d 111, 133-34.) In making that determination, a reviewing court will examine the challenged comment in the context of the entire proceeding. *United States v. Robinson* (1988), 485 U.S. 25, 31-32, 99 L. Ed. 2d 23, 31, 108 S. Ct. 864, 868-69; *Hopkins*, 52 Ill. 2d at 6-7.

Having examined the record in this case, we conclude that the prosecutor's remark was an impermissible comment on the defendant's failure to testify. The prosecutor expressly referred to the absence of any testimony—anything "from the witness stand"—to contradict the statements appearing in the defendant's confessions. The witness who would have presented this evidence was, of course, the defendant. Accordingly, the trial judge erred in failing to sustain defense counsel's objection to the prosecutor's argument.

Although comment on a defendant's failure to testify is constitutional error, the error does not inevitably re-

quire that the defendant be granted a new trial. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Notwithstanding the occurrence of constitutional error at trial, a criminal conviction may be affirmed if the reviewing court is able to conclude, upon examination of the entire record, that the error was harmless beyond a reasonable doubt. *United States v. Hasting* (1983), 461 U.S. 499, 510-11, 76 L. Ed. 2d 96, 107, 103 S. Ct. 1974, 1981 (*Griffin* violation found to be harmless); *Chapman*, 386 U.S. at 24-26, 17 L. Ed. 2d at 711, 87 S. Ct. at 828-29 (*Griffin* violation found to be prejudicial).

We conclude that the error occurring in the case at bar was harmless beyond a reasonable doubt. In the case at bar, the evidence of the defendant's guilt was overwhelming. The State presented eyewitness testimony detailing the defendant's commission of the present offenses. The State also introduced evidence of the defendant's oral and signed confessions to the instant offenses, in which the defendant admitted his intention to commit an armed robbery, described the steps he took toward that end, and admitted shooting Ridgell. Finally, we note that the jury was instructed that closing arguments are not evidence. (See Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2d ed. 1981).) In these circumstances, we conclude that the prosecutor's brief comment was harmless beyond a reasonable doubt. See *People v. Arman* (1989), 131 Ill. 2d 115, 127-28.

The defendant alleges two further instances of prosecutorial misconduct during closing argument at the guilt-innocence phase of the proceedings. In rebuttal argument, the prosecutor stated:

"Tecora did a nice job up there, she put it on his client. And what do we have to do? We have got to throw a little mud on it. How do we do that?

First thing he calls her Mrs. Tecora Mullen, throw a little dirt out on her. She's out with some other guy. Her name was Tecora Mullen, she was single, lived in the apartment building.

He can throw a little mud on her—

[Defense counsel]: Objection.

THE COURT: Objection overruled. The jury heard the evidence."

The defendant contends that the prosecutor's remark was an improper attack on defense counsel.

We agree with the State that the prosecutor's comment, made in rebuttal argument, was a proper response to, and was invited by, defense counsel's own comments in summation. In closing argument, defense counsel stated that Mullen was "hiding" around the corner from her home, suggesting that there was something improper about Mullen's presence with Ridgell in his car, and at one point in summation referred to the witness as "Mrs. Mullen." It will be recalled that the trial judge had previously granted the State's motion *in limine* to bar defense counsel from introducing evidence that Mullen was married at the time of the offenses charged here. In commenting that Mullen was "hiding" in the victim's car, and in referring to the witness as "Mrs. Mullen," defense counsel apparently was seeking to accomplish indirectly what the trial judge had forbidden him to do directly. Accordingly, we find no error in the challenged comment.

In his final allegation of trial error, the defendant contends that the prosecutor, in closing argument, misstated the law of attempt. The defendant complains of the following portion of the prosecutor's summation:

"So, certainly Stanley Howard took a substantial step towards committing an armed robbery that night, in leaving that house, stalking that neighborhood, and stalking those people."

Defense counsel did not object to the quoted comment. The defendant now argues that the prosecutor's remark incorrectly stated the requirements for a conviction for an attempted offense, and that the misstatement constitutes plain error under Supreme Court Rule 615(a), warranting our review notwithstanding counsel's failure to object. See 134 Ill. 2d R. 615(a) (on review, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").

We find no error, much less plain error, in the circumstances here. Under Illinois law, "[a] person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a).) The prosecutor correctly argued that the defendant, in arming himself, in locating intended victims, and in approaching their car and engaging the driver in conversation, had taken a substantial step toward committing an armed robbery. Moreover, if error occurred, it was not plain error. As we have stated, the jury received the standard instruction concerning the role and purpose of opening statements and closing arguments. In addition, the jury was properly instructed on the law of attempt. See Illinois Pattern Jury Instructions, Criminal, Nos. 6.05, 6.07 (2d ed. 1981).

II

A

The defendant also raises a number of challenges to the capital sentencing hearing conducted in the present case. We shall discuss these issues in the sequence in which they arose in the proceedings below. The defendant first contends that the trial judge improperly limited

defense counsel's opening statement and closing argument during the first, or eligibility, stage of the bifurcated sentencing hearing. Specifically, the defendant asserts that the judge erred in sustaining prosecution objections to counsel's argument that the jurors, in determining the defendant's eligibility for the death penalty, should consider any residual doubts they might have regarding the defendant's guilt for the attempted armed robbery conviction. It will be recalled that the sole basis for the defendant's eligibility for the death penalty was his commission of the murder in the course of an attempted armed robbery.

The defendant's allegation of error rests, of course, on the premise that counsel was entitled to argue the issue of residual doubt to the sentencing jury, and to suggest to the jurors that any lingering doubts they might have of the defendant's guilt for the charged offenses could be given weight here in determining whether the defendant could be sentenced to death. We note the existence of authority suggesting that a defendant in a capital sentencing proceeding has no right, constitutional or otherwise, to argue to the trier of fact that residual, or lingering, doubts concerning guilt for the underlying offense may be considered in determining whether the defendant may or should be sentenced to death. (See *Franklin v. Lynaugh* (1988), 487 U.S. 164, 172-75, 101 L. Ed. 2d 155, 165-66, 108 S. Ct. 2320, 2326-28 (plurality opinion); *Franklin*, 487 U.S. at 187-88, 101 L. Ed. 2d at 174-75, 108 S. Ct. at 2332-33 (O'Connor, J., joined by Blackmun, J., concurring in the judgment); *People v. Morgan* (1991), 142 Ill. 2d 410, 466-67; *People v. Steidl* (1991), 142 Ill. 2d 204, 255-56; *People v. Fields* (1990), 135 Ill. 2d 18, 66-68; see also *People v. Jones* (1988), 123 Ill. 2d 387, 421-22.) We need not determine in this case whether a capital defendant enjoys the right asserted here. From a review of the record in this case, we con-

clude that the trial judge, notwithstanding his initial rulings on the matter, ultimately allowed defense counsel to present the issue to the jury. *Cf. Fields*, 135 Ill. 2d at 68-69 (finding no interference at sentencing hearing with defendant's presentation of residual doubt theory).

The trial judge permitted defense counsel to thoroughly explore the same issue in her closing argument during the first stage of the sentencing hearing. At that time, defense counsel was permitted to argue at length that the evidence was insufficient to sustain the defendant's conviction for attempted armed robbery, and counsel urged the jurors to return a verdict finding the defendant not eligible for the death penalty if they entertained doubt whether the defendant was guilty of that offense. The trial judge denied the prosecution's repeated objections to the defense argument. In light of defense counsel's subsequent argument to the jury, we are unable to say that the court's initial restrictions operated to deny counsel the right the defendant claims.

The defendant presses the related contention that the prosecutor, in rebuttal argument, improperly suggested to the jury that defense counsel was erroneously attempting to reopen the case by challenging the strength of the evidence of the defendant's guilt of armed robbery. In rebuttal argument at the conclusion of the first stage of the sentencing hearing, the prosecutor insisted that the defendant's eligibility for the death penalty had been established through the certified copies of the defendant's convictions and his birth certificate. Referring to defense counsel's argument on residual doubt, the prosecutor then stated, "She is trying to re-open and pry into your minds from yesterday. That's improper." The trial judge overruled defense counsel's objection to this comment.

We believe that the prosecutor's comment was invited by defense counsel's preceding argument, in which coun-

sel stressed to the jury her contention that there remained residual doubt of the defendant's guilt for attempted armed robbery, on which the defendant's eligibility for the death penalty was dependent. As we have stated, it is not clear that a capital defendant has a right to urge the sentencing authority to consider residual doubt of his guilt of an underlying offense in determining whether he may or should be sentenced to death. Assuming that a capital defendant may make that argument, we do not believe that the comment challenged here interfered with the exercise of that right. If a defendant is to be allowed to impeach the verdict by appealing to individual jurors' lingering doubts over its justness, we also believe that the prosecutor should not be disabled from attempting to remind the jury of the validity of that same verdict. We think that the jury in the present case would have construed the prosecutor's comment—"That's improper"—as relating to the strength of the stipulated evidence establishing the defendant's death eligibility. It will be recalled that the trial judge overruled prosecution objections to defense counsel's argument concerning residual doubt, and counsel was allowed to present that argument fully. On this record, we cannot say that the prosecutor's brief comment would have interfered with the jury's consideration of the defense theory.

B

The defendant next contends that the trial court erred in failing to grant the jury's request for a copy of his formal confession. The jury made the request during its deliberations at the first, or eligibility, stage of the sentencing hearing. At that point in the proceedings the following ensued:

"THE COURT: Let the record reflect we're in chambers. The jury sent out a note. Initial E.D. 'We would like

to see Mr. Howard's deposition regarding his understanding of the course of events on May 20, 1984.'

You want me to put on the back of it there is no deposition; continue to deliberate?

[Assistant State's Attorney]: Well[,] I assume they mean statement.

THE COURT: It is not in evidence. Well[,] there is a statement but there is no deposition. You have all the evidence. Continue to deliberate.

[Assistant State's Attorney]: They should be instructed they have all the evidence relating to eligibility. Continue to deliberate."

Before this court, the parties agree that the jury was seeking a copy of the defendant's formal statement. The defendant correctly notes that his confession was admitted into evidence at trial and that the exhibit accompanied the jury to the jury room during deliberations at that point in the proceedings. The defendant now contends that the trial judge failed to exercise his discretion in framing a response to the jury's request; the defendant further argues that the judge, in the proper exercise of discretion, would have granted the jury's request.

The defendant's trial counsel did not object to, or otherwise comment on, the judge's handling of the jury's request. Indeed, counsel may have believed that the court's disposition of the matter would operate to the defendant's advantage. The exhibit requested by the jury was entirely inculpatory: it contained the defendant's confessions to the two offenses with which he was charged, murder and attempted armed robbery. Trial counsel could well have construed the jury's mid-deliberations request as signifying that the jurors were giving weight to defense counsel's plea that they consider any residual doubts they might have concerning the defendant's guilt in this case. Having argued strenuously that residual doubt of the defendant's guilt of the offense of attempted armed robbery should preclude imposition of

the death penalty, defense counsel might have considered that the jury's request reflected such doubt, and thus might also have believed that sending the statement to the jury room would work against the defendant. Defense counsel did not make a contemporaneous objection to the trial judge's handling of the request, nor did counsel raise the issue in the defendant's post-trial motion. These omissions suggest to us that counsel was satisfied with the way in which the inquiry was handled. Indeed, we fail to see in what respect the defendant could have benefited if the exhibit had been sent to the jury. We therefore decline to consider whether the trial judge abused his discretion in failing to grant the jury's request.

## C

The defendant next raises several challenges to evidence introduced or excluded at the second stage of the sentencing hearing. The defendant first contends that certain inadmissible information, consisting of victim impact evidence and improper comments on the personal characteristics of the victims, was erroneously introduced at the death sentencing hearing, in violation of both Federal and State law (see *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529; *People v. Holman* (1984), 103 Ill. 2d 133). The defendant asks that the cause be remanded for a new sentencing hearing.

The defendant specifically complains of testimony elicited from three of the State's witnesses, and we shall briefly review the pieces of information challenged by the defendant. The first witness was the victim of the March 13, 1983, occurrence, when the defendant accosted a woman and her young son, drove them to the woman's mother's house, and later returned with them to their own home. The woman testified that her son,

who was present during the ordeal, is still adversely affected by the occurrence and is fearful of certain strangers. The trial judge overruled defense counsel's objection to this testimony. The second witness was the Blue Island homeowner who was sexually assaulted during the June 21, 1984, break-in and robbery. During her testimony, the woman referred to the effects of the offenses on her. In addition, she briefly mentioned her grandchild and her charitable work. Defense counsel made no objection to this information. The third witness was a person who served on the jury in the trial of the series of offenses committed by the defendant on May 27, 1983, when he kidnapped a female deputy sheriff, drove her to the home of her sister-in-law, and there sexually assaulted the two woman. Without defense objection, the juror testified that the male cousin present in the house during that time did not appear as a witness, for he had moved from the area and later could not be located. The defendant notes that the prosecutor made several references to this information in closing argument, when he reminded the jurors of the effects of the defendant's offenses. At no time during argument did defense counsel object to those comments.

The defendant now contends that this evidence and argument denied him his right under Federal and State law to a fair sentencing hearing. In reply, the State asserts that the information was properly presented because it related to the circumstances of the defendant's various offenses. The State does not expressly attempt to distinguish this case from the authorities cited by the defendant on the ground that the information introduced in the present action did not relate to the impact of the offense on the murder victim's survivors. Accordingly, we do not consider the defendant's contention on that more limited ground.

The Federal basis for the defendant's contention has now been removed. *Booth* was recently overruled in *Payne v. Tennessee* (1991), 501 U.S. ___, 115 L. Ed. 2d 720, 111 S. Ct. 2597. Although the Court reserved ruling in *Payne* on one additional aspect of the *Booth* opinion—the admissibility of surviving family members' views on the appropriate sentence in a case—such evidence was not presented in the proceedings below and thus is not at issue here.

Because the defendant relies not only on Federal law but also on State law as authority for his present argument, it is appropriate that we reexamine at this time the law of our own State regarding this issue. Decisions of this court have found reversible error in efforts by the prosecution to present victim impact evidence as grounds for finding a defendant guilty of murder or for imposing sentence. (See, *e.g., People v. Bernette* (1964), 30 Ill. 2d 359, 370-73; *People v. Gregory* (1961), 22 Ill. 2d 601, 605-06; *People v. Dukes* (1957), 12 Ill. 2d 334, 340.) It must be noted, however, that this line of authority predates the changes in capital sentencing procedures mandated by the Supreme Court's decision in *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, when a defendant's guilt and sentence were determined in a single proceeding. Since *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, and its progeny, capital trials in Illinois have been conducted on a bifurcated basis, with the guilt determination separated from the sentencing determination. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).) The sentencing determination requires, as a constitutional matter, an individualized consideration of the offense and the offender. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) While we do not intend to suggest the victim impact evidence will be relevant at the guilt-innocence phase of a

capital trial, we do not believe that anything in the Illinois Constitution automatically forbids its introduction at a capital sentencing hearing. In this regard, we find persuasive the reasons that prompted the United States Supreme Court to overrule *Booth*. In *Payne* the Court declared that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Payne*, 501 U.S. at ____, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.) We agree with the Court that such evidence is relevant to a consideration of the appropriate punishment for a capital defendant. Accordingly, we now choose to align ourselves with the Court rule on this subject. Accordingly, we find no error in the presentation of the evidence now challenged by the defendant.

The defendant also argues that unreliable evidence of his participation in an unproved crime was introduced at the second stage of the sentencing hearing. The challenged testimony concerns the June 20, 1983, residential break-in committed by an unknown, masked intruder. The defendant was initially charged with the offense, but the case was later dismissed because the residents were unable to identify the defendant as the intruder.

During the second stage of the defendant's sentencing hearing, the State presented evidence of a break-in and armed robbery committed at a Chicago home on June 20, 1983. On that occasion, a masked intruder entered the residence, threatened a woman with a weapon, and removed several items of jewelry from around her neck. While the intruder was rummaging through a closet, the woman's husband returned home, surprising the intruder. The intruder then fled. The husband gave chase, but the intruder eluded him. The intruder was wearing a long black coat.

The husband later learned that a man wearing a long black coat had been seen by two youths around the time of the break-in and several blocks from the house. Five days later, the two youths saw the same man, the defendant, in a nearby tavern. The youths reported this information to the husband, who notified the police. The defendant was then wearing certain items of jewelry that had been taken during the break-in. The defendant explained to the arresting officer that he had purchased the jewelry from someone on the street.

To be admissible at a capital sentencing hearing, evidence must be both relevant and reliable. (See *People v. Free* (1983), 94 Ill. 2d 378, 422-23.) The record in this case sufficiently supports the inference that the defendant committed the break-in. The husband testified that the intruder was wearing a long black coat on the June night of the incident. Around the same time, two other persons saw a black-coated figure a short distance from the house, and they later saw the same person—the defendant—in a nearby tavern. He was then in possession of jewelry that had been taken from the house. This evidence tended to show the defendant's responsibility for the offense. We conclude that the testimony was both relevant and reliable and thus was admissible at the defendant's sentencing hearing. (*Cf. People v. Adams* (1985), 109 Ill. 2d 102, 128-29 (erroneous admission of evidence that defendant fled from police officer investigating robbery committed in vicinity where defendant was found; no evidence that defendant was identified as robber).) We also note that the jury in the present case was fully informed that the charges against the defendant were dismissed because the homeowners were unable to identify the defendant as the intruder. Thus, unlike *Lewis v. Lane* (7th Cir. 1987), 832 F.2d 1446, cited by the defendant, here the sentencing jury was not misled

about the status of the charges against the defendant. We find no error in the introduction of this evidence.

The defendant next contends that the State introduced unreliable evidence suggesting that he had on one occasion sold marijuana. The challenged information was presented during the testimony of the police officer who arrested the defendant for possession of marijuana on May 29, 1983. The police officer stated that he was responding to a report of a person selling marijuana at a certain location. The officer found the defendant at that location and placed him under arrest after the defendant threw away an envelope containing a small quantity of marijuana. The defendant had $195 in his possession at the time. The defendant was later charged with and convicted of a misdemeanor for that offense.

We find no error in the admission of this testimony, for we do not believe that it improperly suggested that the defendant had sold marijuana. The report of marijuana selling was offered merely to show why the officer went to the particular location at that time. The jurors were informed that the defendant was charged with and convicted of a misdemeanor possession offense in connection with that incident. The jury was in no manner misled regarding the defendant's offense.

We must also reject the defendant's related contention that the prosecutor misrepresented the nature of the defendant's conviction in summarizing this evidence in closing argument at the second stage of the sentencing hearing. At that time the prosecutor noted that the arresting officer had received a report of a man selling marijuana, that the officer then found the defendant at the location, and that the defendant was later convicted of "that"; the prosecutor did not identify the particular offense. No objection was made to this argument. It is not clear whether the jury would have construed the prosecutor's remark as suggesting that the conviction

was for selling marijuana. In any event, the comment was so fleeting, and the competent evidence so aggravating, that we do not believe that the prosecutor's remark could have had any effect on the jury's deliberations.

The defendant also complains that the State improperly presented testimony of an outstanding warrant for his arrest on a charge of obstructing a police officer. This information was introduced during the testimony of a Blue Island police officer concerning the photographic array viewed by the victims of the June 21, 1984, Blue Island home invasion. The officer testified that the defendant's photograph had been obtained from the Orland Park police department, where the defendant was wanted on a charge of obstructing a police officer. Defense counsel did not object to this testimony. On cross-examination, defense counsel elicited from the officer the information that the obstruction charge would have been a misdemeanor.

In view of the minor nature of the Orland Park charge, and the gravity of the offenses properly introduced into evidence in aggravation, we cannot say here that the information regarding the outstanding warrant was so prejudicial that the defendant was denied a fair sentencing hearing.

The defendant next contends that the trial court improperly restricted his presentation of mitigating evidence at the second stage of the sentencing hearing by sustaining the State's objection to a defense witness' testimony that she did not believe that the defendant ought to receive the death sentence in this case. During direct examination, defense counsel asked Betty Howard, the defendant's aunt, whether she believed the defendant should be sentenced to death. The witness said no. The prosecutor then objected, and the court sustained the objection. The defendant concedes that the trial judge's ruling on the objection was consistent with this court's

opinion in *People v. Stewart* (1984), 105 Ill. 2d 22, 67, and asks that we reconsider *Stewart's* holding on the issue. This we decline to do.

In *Stewart*, this court held that a witness' opinion that a defendant should not be sentenced to death is not admissible at a capital sentencing hearing. (*Stewart*, 105 Ill. 2d at 67; see also *Stewart*, 105 Ill. 2d at 67-68 (also rejecting evidence of attitudes generally toward capital punishment); *People v. Yates* (1983), 98 Ill. 2d 502, 535 (same); *People v. Williams* (1983), 97 Ill. 2d 252, 300-01 (same).) We continue to adhere to that view. The decision whether a defendant is to be sentenced to death is made by the sentencing authority in the particular case—judge or jury. Although the testimony of witnesses in aggravation or mitigation concerning the nature and circumstances of the offense and the offender is relevant to that determination, their own opinions regarding what sentence should be imposed are not. Certain comments appearing in this court's opinion in *People v. Caballero* (1989), 126 Ill. 2d 248, cited by the defendant in support of the present argument, are not to the contrary. In that case, the court remanded the cause for an evidentiary hearing on the defendant's post-conviction contention that trial counsel was ineffective for failing to investigate possible sources of mitigating evidence and for failing to present those witnesses at the defendant's death penalty hearing. The court agreed that several potential witnesses might have provided favorable testimony, and noted that those persons did not believe that the defendant deserved the death penalty. (*Caballero*, 126 Ill. 2d at 281.) Of course, the court's purpose in characterizing the potential witnesses' views on the question whether the defendant should receive the death penalty was simply to demonstrate the potential use of those persons as defense witnesses in mitigation. We do not construe the

court's comments as departing from this court's earlier decisions on the issue.

## D

The defendant also raises a number of issues concerning the prosecutor's closing argument at the conclusion of the second stage of the sentencing hearing. The defendant first contends that the prosecutor erred in repeatedly telling the jurors that their verdict in the case would serve only as a recommendation to the trial judge, in violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633. During summation at the close of the second stage of the sentencing hearing, the prosecutor stated:

> "That alone makes this individual eligible for the court to impose the death penalty.
>
> * * *
>
> That is the recommendation that we are asking you to make to the Court, ***.
>
> * * *
>
> And the evidence, the testimony, and the Exhibits that you have all heard, require that justice be served in this case, and that you make a recommendation for the death sentence for Stanley Howard."

The defendant also cites the following comments made by the prosecutor during rebuttal argument:

> "Or, you say to the Judge: We considered those factors and he had a nice childhood, a nice family.
>
> * * *
>
> Judge, here is our recommendation to you. Here is what we are telling you that we as members of the community believe should be done with him.
>
> * * *
>
> And that is to tell this Judge: Judge, here is what this penalty should be."

The defendant contends that the prosecutor's remarks misled the jurors by diminishing their sense of responsibility for their verdict. The defendant failed to object to any of these comments, and the present contention will therefore be deemed waived unless the prosecutor's misdescription of the jury's role rises to the level of plain error.

We agree with the defendant that some of the comments quoted above are not accurate statements of the jury's function in a capital sentencing hearing. Here, it was the jury's role, and not the judge's, to determine whether the defendant would be sentenced to death; the jury was doing more than making a recommendation concerning the appropriate sentence. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(g).) Still, we do not believe that the jury was actually misled regarding its function in the sentencing hearing. Unlike the trial judge in *Caldwell*, the trial judge in the present case did not endorse the prosecutor's misstatements. Instead, the jurors were fully and accurately instructed on their role in the proceedings and on the significance of their determination; the defendant makes no challenge to those portions of the jury instructions. In this context, we do not believe that the prosecutor's scattered references to the sentencing determination as a "recommendation" misled the jurors regarding their role in the present case. We note too that there was not a close balance between the aggravating and mitigating evidence presented at the sentencing hearing. Rather, the aggravating evidence was particularly compelling, and we do not believe that the misstatements now challenged had any effect on the jury's deliberations. For these reasons, we do not agree with the defendant that the comments complained of constituted plain error. See *People v. Fields* (1990), 135

Ill. 2d 18, 53-58; *People v. Perez* (1985), 108 Ill. 2d 70, 89-91.

The defendant also argues that the prosecutor misstated the applicable law regarding the role of mercy in capital sentencing proceedings. During summation, the prosecutor stated:

"This is not a court of mercy. And the Defense is going to ask you for mercy. Mercy for Stanley Howard. But you all have an obligation.

\* \* \*

This is not a court of mercy, a court of prejudice, a court of personal feeling, religious feelings. It is a court of justice."

Defense counsel failed to object to these comments. The defendant now contends that the prosecutor's comments misled the jury on the proper role of mercy in a capital sentencing proceeding. We do not agree. We believe that the jurors would have properly understood the prosecutor's argument as a reminder that they were to make their sentencing determination on the basis of the evidence presented at the hearing, not on extraneous considerations divorced from that evidence. We find no error here.

The defendant next contends that the prosecutor misled the jury concerning the applicability of the death penalty in homicide cases. During rebuttal argument, the prosecutor asked rhetorically, "Is this a crime, a series of crimes that were done out of passion, jealousy, revenge?" The trial judge overruled the defendant's objection to the remark. The defendant now argues that the jury would have understood the comment to signify that the death penalty would be appropriate punishment in all cases in which the emotions specified were not present. We do not agree that the remark can stand the strained construction the defendant seeks to attribute to it. In our view, the jury would have interpreted the prosecu-

tor's statement as a comment on the absence of any extenuating circumstances surrounding the commission of the murder here. As the evidence showed, the defendant approached Oliver Ridgell, engaged him in a brief conversation, and then shot him. There was nothing mitigating in the murder itself, or in the circumstances leading up to its commission. We find no error in the prosecutor's comment.

The defendant also contends that the prosecutor argued facts that were not in evidence. Specifically, the defendant complains of certain remarks made by the prosecutor concerning the testimony of defense witness Henry Troka, who provided favorable testimony with respect to the defendant's conduct while incarcerated. During summation the prosecutor asserted that Troka was returning a favor to the defendant by testifying in his behalf at the sentencing hearing. The prosecutor stated:

> "Lieutenant Troka, well, he is the Lieutenant in Division 1. Stanley has done us a couple favors. Stanley is a snitch, helped him find a few guns. Turned in a couple of offenders. Lieutenant Troka.
>
> Stanley helped him out a little bit. One favor for another. So he's here to return the favor."

Defense counsel did not object to this comment. The defendant now argues that the comment assumed an exchange of benefits between Troka and the defendant when there was no evidence to support that assumption.

The prosecutor's remark was not plain error. The evidence showed that the defendant, while an inmate at the county jail, assisted the lieutenant in several matters. From this, one may infer that the witness, in providing favorable testimony at the sentencing hearing, was simply helping the defendant in return by relating during the hearing the assistance he had previously received from the defendant. In any event, the prosecutor made no attempt to dwell on this particular point. We conclude

that the prosecutor's comment was not error and, further, that if error occurred it was harmless, in light of the fleeting nature of the comment and the strength of the prosecution's evidence in aggravation.

The defendant next contends that the prosecutor improperly argued that the defendant might later be released on parole if he was not sentenced to death. During rebuttal, the prosecutor made the following remarks:

"[Defense counsel] says, well, he may go to prison, he may never be a free man. Well, we don't know that. He can't tell us anything about that.

And he can't guarantee anything to you about his future.

But there is one absolute in this State, and there is one guarantee that will protect everybody else and the rest of society. And you people know what that is."

Defense counsel failed to object to this remark. The defendant now contends that the comment improperly suggested to the jury the possibility that he might later be freed on parole if he was not sentenced to death. The defendant notes that this court has previously condemned prosecutorial argument suggesting the possibility of a capital defendant's later parole. See *People v. Lyles* (1985), 106 Ill. 2d 373, 409-11.

We agree with the State that the prosecutor's comment was invited by defense counsel's own argument in summation. Defense counsel told the jurors that the defendant, if not sentenced to death, could not later be released from prison except through executive clemency. This was not true, for a term of natural life imprisonment was not the sole alternative to a sentence of death in the present case (see Ill. Rev. Stat. 1983, ch. 38, pars. 1003—3—3, 1005—8—1(a)(1)). Accordingly, we conclude that the defendant could not have been prejudiced by the prosecutor's reference to parole, which was made in response to the defendant's own, erroneous argument. See

*United States v. Young* (1985), 470 U.S. 1, 12-13, 84 L. Ed. 2d 1, 10-11, 105 S. Ct. 1038, 1045; *People v. Richardson* (1988), 123 Ill. 2d 322, 355-56.

The defendant next contends that the prosecutor, in rebuttal argument, made inflammatory appeals to the jury's emotions. During rebuttal, the prosecutor argued that the jurors should equate their imposition of the death penalty with military service in World War II or Vietnam and that they must similarly protect society; that the jury should not forgive the defendant for what he had done to the victims of his offenses; that the jury was to impose the death penalty for the sake of the community at large, and that the failure to do so would mean that society does not care about victims. The trial judge overruled defense counsel's objections to all these remarks.

The control of closing argument is left largely to the discretion of the trial judge, who is able to observe the trial proceedings and gauge the prejudicial effect, if any, of the parties' arguments. (See *People v. Smothers* (1973), 55 Ill. 2d 172, 176.) We cannot say that the trial judge abused his discretion in overruling the defense objections to the comments challenged here. Again, we agree with the State that these comments, made during rebuttal, were mainly in response to, and invited by, defense counsel's own comments in summation. Defense counsel asked the jury to refuse to take the defendant's life, commented that any one juror's decision to vote against the death penalty would not "espouse disorder" in society, and urged the jury to act mercifully toward the defendant and his family. It was not improper for the prosecutor to respond to these comments by attempting to remind the jury that a sentence of death in the present case would not be inconsistent with society's mores.

Finally, the defendant contends that the prosecutor improperly suggested to the jurors that they ignore the

defendant's mitigating evidence. Addressing the testimony of defense witness Troka, the prosecutor stated in rebuttal:

> "Come on, Lieutenant. Let's not kid each other. Socially redeeming qualities? You are not going to receive any instructions about them. And [defense counsel] likes to use the word."

The defendant argues that this comment invited the jurors to ignore or disregard the mitigating evidence introduced at the sentencing hearing.

The defendant failed to object to this portion of the prosecutor's argument, and we do not consider that the remark rose to the level of plain error. The prosecutor observed only that the jury instructions would not contain a particular phrase favored by defense counsel. We do not construe the remark as suggesting that the jurors should disregard the defense evidence. We note that the prosecutor went on to state that, even if the defendant possessed such qualities, he could not be rehabilitated. It thus appears that the prosecutor was not improperly denying the potential effect of the defendant's mitigating evidence; rather, the prosecutor, within the bounds of proper argument, was simply disputing whether it existed.

E

The defendant next contends that the trial judge erred in refusing defense counsel's request that the sentencing jury be instructed that the defendant might be sentenced to a term of natural life imprisonment if he was not sentenced to death. It should be noted that natural life imprisonment was not the required alternative to a sentence of death in the present case, for the defendant had not previously been convicted of murder, and thus natural life was not the mandatory alternative to a death sentence in the present case. (See Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(1)(b), (a)(1)(c); *cf. People v. Gacho* (1988),

122 Ill. 2d 221, 260-63 (when natural life imprisonment is the sole alternative to a sentence of death, jury should be instructed to that effect, in proceedings conducted after February 11, 1988, the date of that decision).) Using the standard instruction, the trial judge in the present case told the jury that the defendant would be sentenced to a term of imprisonment if he was not sentenced to death. See Illinois Pattern Jury Instructions, Criminal, No. 7A.15 (2d ed. 1981).

The defendant contends that the jurors should have been specifically instructed that a term of natural life imprisonment was one of the available sentencing options. The defendant contends that the possibility of a term of natural life imprisonment would qualify as a mitigating circumstance in the eyes of the sentencing jury. The defendant thus concludes that the refusal to use the tendered instruction denied him the opportunity to present this additional mitigating circumstance to the jury that was deliberating his fate. We find no error here. The defendant's tendered instruction was potentially misleading, because it highlighted one sentencing alternative without mentioning any of the other dispositions possible here. See Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1).

F

The defendant also contends that death is an excessive sentence in the present case. The defendant asserts that the circumstances of the present offenses and the evidence of his adjustment to incarceration make this an appropriate case in which the jury's sentencing determination should be overturned. We do not agree. The evidence establishes that the defendant shot and killed Oliver Ridgell in cold blood, in an aborted attempt at armed robbery. Moreover, as demonstrated by the State's aggravating evidence, the defendant has an extensive history of vi-

olent criminal activity. Finally, the defendant offered little evidence in mitigation. The jury had before it evidence of the defendant's commission of the present offenses as well as substantial evidence of the defendant's lengthy criminal record. On this record, we cannot say that the defendant's sentence is excessive, or inappropriate, and therefore we decline to disturb the jury's determination. See *People v. Flores* (1989), 128 Ill. 2d 66, 100-01; *People v. Walker* (1985), 109 Ill. 2d 484, 506-07.

## G

In his final series of arguments, the defendant challenges the facial validity of the death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1). The defendant contends that various aspects of the statutory scheme violate the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). As we discuss below, the same arguments have been rejected on other occasions; the present defendant offers no persuasive ground that would warrant our reconsideration of those holdings.

It has been held that the statute is not invalid for the discretion it affords the prosecutor in determining whether to seek the death penalty in a particular case. (*Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 993-94; *People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) The statute does not unconstitutionally cast on the defendant the burden of establishing that a sentence other than death should be imposed in his case (*Silagy*, 905 F.2d at 998-99; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Caballero* (1984), 102 Ill. 2d 23, 49), nor is the statute invalid for failing to require the State to carry a burden of persuasion at the second stage of the sentencing hearing (*People v. Jones* (1988), 123 Ill. 2d 387, 426; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Free* (1983), 94 Ill. 2d 378, 421). It has been held that the stat-

ute affords sufficient information-gathering procedures for adequate appellate review. (*People v. Albanese* (1984), 104 Ill. 2d 504, 541-42; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.) Finally, the statute is not invalid for failing to require the sentencing authority to make a separate, additional finding that death is the appropriate penalty. *People v. Whitehead* (1987), 116 Ill. 2d 425, 462-63; *People v. Guest* (1986), 115 Ill. 2d 72, 112; *People v. Morgan* (1986), 112 Ill. 2d 111, 147.

\* \* \*

For the reasons stated, the defendant's convictions and sentences are affirmed. The clerk of this court is directed to enter an order setting Wednesday, March 18, 1992, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*

JUSTICE BILANDIC took no part in the consideration or decision of this case.

JUSTICE FREEMAN, specially concurring:

I agree with the majority's final disposition of the issues raised in this appeal. However, I disagree with the majority's use of this case as the vehicle to adopt the Supreme Court's recent holding in *Payne v. Tennessee* (1991), 501 U.S. ___, 115 L. Ed. 2d 720, 111 S. Ct. 2597.

The challenged victim impact statements in this case, unlike those in *Payne*, involved statements of victims of

defendant's other crimes. Recognizing this distinction, the majority decides it will not consider defendant's asserted error on the narrow issue of the admissibility of victim impact statements. It nevertheless seizes this opportunity to "align [itself] with the Court rule on this subject."

I believe that the majority, in so deciding, has acted prematurely. In one broad stroke, the majority appears to overrule a significant and settled principle of law in Illinois. I would advocate a more prudent approach on so important an issue. This court's reconsideration of the admissibility of *Payne*-type victim impact statements is better left to a future time and case, where the parties on each side of the issue have been afforded the benefit and opportunity of full and fair argument.